Clayton JACKSON, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000390–MR.

Supreme Court of Kentucky.

March 21, 2013.

Julia Karol Pearson, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, James Daryl Havey, Assistant Attorney General, Criminal Appellate Division, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

A Clay Circuit Court jury found Appellant, Clayton Jackson, guilty of three counts of murder and one count of first-degree arson. For these crimes, he was sentenced to life imprisonment without the possibility of parole.

He now appeals as a matter of right, Ky. Const. § 110(2)(b), alleging that the trial court erroneously: (1) entered non-unanimous verdicts or, in the alternative, failed to grant his motion for a directed verdict; (2) denied his motion to designate a particular juror as an alternate; (3) permitted prosecutorial misconduct and misstate-

ments during the Commonwealth's closing arguments; (4) denied his motion to suppress his confession; (5) permitted the Commonwealth's expert to testify under KRE 702; (6) failed to include a life option instruction and reasonable doubt definition in its jury instructions; and (7) failed to give a wanton murder instruction.

## I. BACKGROUND

In the early morning hours of February 6, 2004, a bus driver noticed smoke coming from Chris and Amanda Sturgill's trailer. The fire department extinguished the fire and found five bodies inside. Chris and Amanda had been shot with arrows and Amanda's body had been used to ignite the fire. Their three children died from smoke inhalation. A short distance from the Sturgill home, Chris Sturgill's truck was found in an abandoned mine with the interior burned.

Appellant's mother, who was at the scene that morning, asked authorities if they found a sixth body. Appellant's girlfriend, Shirley Mae Barrett had informed her that Appellant was at the Sturgill trailer the previous evening and that Barrett had been unable to get in touch with him.

Barrett, along with Billy Collett, Appellant's friend, reached Appellant through a three-way telephone conversation later that morning. When Barrett asked Appellant why he had failed to contact her before bed—as was his custom—he told her that he had passed out from drinking. The three also discussed the murders in the Sturgill trailer. When Collett referred to Chris's coal truck, Appellant told him that fingerprints would not be found inside the vehicle's cabin. When Barrett informed the authorities of Appellant's whereabouts on the night in question, they questioned him.

When questioned, Appellant stated he was with Collett that night working on Collett's ATV. After drinking beer and smoking marijuana, Appellant told Collett he was going to visit Chris and left the Collett residence with several beers in his pocket. Appellant stated that before going to Chris's residence, however, he went down to a creek bank by a bridge to urinate and drink beer. Appellant claimed that Chris arrived at his home later that night, took him to the liquor store, and then back home to Appellant's trailer. Appellant stated that he passed out at his home an hour or so later.

Appellant permitted detectives to search his trailer and they found a bow and arrow, marijuana, and a sawed-off shotgun. As a result of the search, Appellant was indicted on federal charges and eventually incarcerated at the Federal Correctional Institution in Beckley, West Virginia for possession of an unregistered short-barreled shotgun.

While at Beckley, Appellant shared a cell with Kinsey McLeod. After spending some time with Appellant, McLeod informed investigators that he had some information regarding the Sturgill murders. McLeod hoped providing investigators with this information would lead to a reduction of his federal sentence. Although McLeod was unable to record Appellant admitting the crimes, he did obtain a letter from Appellant in which Appellant acknowledged being inside the trailer when it was set on fire. McLeod led Appellant to believe that he would send the letter to his lawyer; however, he forwarded it to investigators.

According to Appellant's letter, he was visiting the Sturgills when two men showed up and began arguing with Chris Sturgill over a methamphetamine deal. During their disagreement, Appellant went to the bathroom, and when he returned, he found one of the men holding Chris's bow.

Frightened, Appellant ran out of the trailer and went home. Another informant, Troy Hanley, however, contradicted the contents of Appellant's letter, stating that Appellant told him that "we set the place on fire" after the drug deal went sour.

Other evidence presented to the jury also linked Appellant to the crime. Appellant was experienced with shooting a compound bow and arrow, having done so with Chris on occasion. A neighbor of the Sturgills also testified that Chris had been attempting to teach Appellant to drive his coal truck. According to the neighbor, Appellant ground the gears of the truck when he drove it. That morning, she heard the gears grind as the truck was driven out of Chris's driveway.

The jury found Appellant guilty of three counts of murder (for murdering the three children) and one count of first-degree arson. It could not reach a verdict on the murders of Chris and Amanda Sturgill or on the theft by unlawful taking charge. The trial court subsequently adopted the jury's recommendation that Appellant serve a life sentence without the possibility of parole.

Further facts shall be developed as needed.

## II. ANALYSIS

### A. Directed Verdict

■■■ Appellant asserts the trial court erred in failing to grant his motion for a directed verdict. This court outlined the standard we use in evaluating a motion for a directed verdict in *Commonwealth v. Benham*:

[T]he trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a

directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

816 S.W.2d 186, 187 (Ky.1991). For our purposes, we review the trial court's ruling on Appellant's motion as follows: " 'If under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, he is not entitled to a directed verdict of acquittal.' " *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983) (*quoting Trowel v. Commonwealth*, 550 S.W.2d 530, 533 (Ky.1977)).

Here, the trial court properly denied Appellant's motion because it would not be clearly unreasonable for a jury to find Appellant guilty of the murders of the three children and First–Degree Arson under the evidence adduced. For instance, Appellant often ground the gears of Chris Sturgill's truck and the morning of the fire, a neighbor heard the gears of the truck grind as someone drove it away. Further, when informed that morning about the murders and the missing truck, Appellant, unprovoked, stated that fingerprints would not be found in the truck's cabin. This leads to the logical inference that Appellant knew the inside of the cabin had been burned in order to prevent fingerprints from being found.

Appellant's credibility was also called into question by the conflicting accounts he gave to others concerning his whereabouts that night. He initially told authorities that he was with Chris Sturgill that evening, but that he did not see Sturgill again after Sturgill dropped him off at his (Appellant's) trailer. In his letter, however, Appellant stated that he was in the Sturgill trailer that night and ran away when he saw one of the men who was arguing

with Sturgill aggressively brandishing a bow. However, in another account provided by Hanley, Appellant admitted that he was involved in setting the fire to the Sturgill trailer.

These conflicting stories damaged Appellant's credibility and Hanley's testimony provided direct evidence of his guilt. The children's deaths resulted from injuries caused by the fire that Appellant told Hanley he was responsible for starting. Given Hanley's testimony—as well as the circumstantial evidence linking Appellant to the crime—it would not be clearly unreasonable for a jury to find Appellant guilty of murdering the Sturgill children and first-degree arson. As a result, the trial court did not err in denying Appellant's motion.

### B. Juror Impartiality

▮ Appellant also claims that the trial court committed reversible error when it failed to designate a juror as an alternate (effectively striking the juror for cause). Following the empanelling of the jury, E.K., a juror, approached the trial judge in the hallway during a break in the trial. Upon resumption of the trial, based on the conversation he had with E.K., the trial judge conducted a bench conference with the attorneys and E.K. present:

Judge: Morning [E.K.].

E.K.: How you doing?

Judge: When I ran into you in the back hallway, you said you knew somebody that we didn't talk about before. Who was that you knew?

E.K.: Eric. That's his—the lady that got killed. That's her brother.

Judge: So you knew—

E.K.: But it's been ten, twelve year ago since we ran around.

Judge: Okay. So you didn't know he was in—

E.K.: No. I didn't know. Well I ain't seen him any since then.

Judge: Okay. Well would it make any difference to you in your—you said you've not seen him in a number of years. Would it make any difference in your ability to be fair and impartial to both sides?

E.K.: I doubt it. I just wanted to let you know I knew him because—

Judge: I appreciate your complete honesty and I trust you at your word, but I want you to think for just a second. You said "I doubt it." I need you to be able to say, now this is going to bother me or this ain't going to bother me. I need to know one way or the other if— just search your own heart and memory. I mean.

E.K.: It would be better to let somebody else serve it.

Judge: That can't be done.

E.K.: Well then I'll do it. I can—I can make the right decision.

Judge: You sure that it won't bother you about—if you knew this guy ten years ago and you sit here and you say "well that guy's not guilty." Can you find him not guilty?

E.K.: If he is not guilty.

Judge: Okay so that won't bother you to see Eric, whatever his name is, it won't bother you if you have to run into him and you found the guy—

E.K.: I mean, I don't see him, it don't bother me.

Judge: It won't bother you?

E.K.: I just wanted to let you know that I did know him.

Judge: I appreciate your honesty. You're a good man. I appreciate you. Any questions?

Commonwealth: So, as I take it, you really don't have a relationship with this guy?

E.K.: No.

Commonwealth: Oh, okay.

E.K.: This has been back teenage years.

Commonwealth: Oh, okay.

E.K.: He use to live with us.

Commonwealth: Oh, okay.

E.K.: We used to run around, all that deal.

Judge: Any questions?

Defense: I'm having a little trouble hearing. Did you say he used to live with you?

E.K.: Well for, yeah with my mom and stuff, for probably a couple of months or so.

Defense: So he was your friend? And you ran around—you were close enough that he actually lived in your home for a couple of months?

E.K.: Yeah, we used to run around together.

Defense: And when the Judge asked you and you said it would be better if somebody else served?

E.K.: It's just when I knew him, back then.

Defense: I'm not saying you've already made up your mind, I'm just saying would that cause you in any way to be against Clayton, because he is accused of killing—

E.K.: No, that's—

Defense:—your friend's sister and her whole family?

E.K.: I guess it's been ten, twelve years ago since I've seen him. I didn't even know him, he knowed me.

Judge: So if the case turns out just like she said in her opening. If it turns out

that that's the proof and you say, whoa, he ain't guilty. You can find him not guilty and not cause you any trouble?

E.K.: Yeah.

Judge: But if the proof is the other way and you think he's guilty, you can find him guilty and there 11 be no problem with you that way?

Juror: Yeah.

Judge: Okay [E.K.]. Go back to the jury room sir. Thank you for your honesty.

The trial judge and lawyers then engaged in the following conversation:

Defense: I'm concerned, because he's actually lived in the household with them. It's more than a friendship, he lived with them.

Judge: I understand the concern. But for him to bring it up and say what he said—

Defense: That's true.

Judge: I don't, I don't think that he has a problem. He just said he thought it should be known.

Defense: Right.

Judge: He didn't say, he said it wouldn't be a problem. I said "well let me get the lawyers."

Defense: Judge, just for the record, I reserve the right to bring that up again when we're getting ready to pick alternates.

Judge: That'd be fine.

Defense: Thank you, Judge.

Judge: Thank you.

When alternates were chosen, however, the trial court denied Appellant's motion to have E.K. designated as an alternate.[1]

---

**1.** The Commonwealth argues that Appellant failed to preserve this issue for review by merely requesting that the juror be designated as an alternate. However, our case law contemplates the removal of jurors for cause by designating them as alternates. *See Lester v.*

*Commonwealth,* 132 S.W.3d 857, 863 (Ky. 2004) ("[T]he law is clear that a trial court may remove a juror for cause as an alternate juror...."); *Hubbard v. Commonwealth,* 932 S.W.2d 381, 383 (Ky.App.1996) (recognizing that a juror may be dismissed for cause by

Thus, Appellant now argues that the trial court committed reversible error when it failed to effectively remove Juror E.K. from the panel by designating him as an alternate.

■ The trial court's denial of Appellant's motion is reviewed for abuse of discretion. *Lester v. Commonwealth*, 132 S.W.3d 857, 863 (Ky.2004) ("A trial court's decision whether to remove a juror from a panel that has already been seated is reviewed for abuse of discretion.") (internal citations omitted). Thus, we ask "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky.2000).

The Sixth Amendment to the United States Constitution and Section 11 of the Kentucky Constitution guarantee a criminal defendant the right to trial by impartial jury.[2] Consequently, RCr 9.36 provides that "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." Challenges to a potential juror's impartiality "must be made before the jury is sworn." RCr 9.36(3). However, a juror may be challenged after being accepted if "the court for good cause permits it." *Id.* Here, E.K. informed the trial court about his concerns after he had already been seated as a juror; and the trial court brought the attorneys to the bench to discuss E.K.'s presence on the jury before ultimately deciding, over Appellant's counsels' reservations, to keep E.K. oh the jury. Having

made this decision, however, the court also acknowledged Appellant's right to renew the challenge during the selection of alternate jurors.

■ In making its RCr 9.36 determination, the court "must weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor." *McDaniel v. Commonwealth*, 341 S.W.3d 89, 92 (Ky.2011) (*citing Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky.2007)). When doing so, it must also "judge the credibility of the juror's answers." *Shane*, 243 S.W.3d at 338. And, "notwithstanding a prospective juror's responses ..., whatever his or her protestations of lack of bias, the juror's close relationship, 'be it familial, financial or situational, with any of the parties, counsel, victims or witnesses,' is sufficient to require the court 'to sustain a challenge for cause and excuse the juror.'" *Brown v. Commonwealth*, 313 S.W.3d 577, 596 (Ky. 2010) (*quoting Marsch v. Commonwealth*, 743 S.W.2d 830, 833 (Ky.1988)). Moreover, as we have stated many times in the past several years, after review, "[a]ny doubts about the ability of a juror to be fair and impartial should be construed in favor of a defendant." *Paulley v. Commonwealth*, 323 S.W.3d 715, 721 (Ky.2010) (internal citations omitted).

Here, we cannot say that the trial judge appropriately weighed E.K.'s responses. When E.K. first addressed the trial court, he was unable to state unequivocally that he could be fair and impartial. *See McDaniel*, 341 S.W.3d at 94 ("[A] trial court abuses its discretion when it seats a

---

designating him or her as an alternate). As a result, we find Appellant's motion to designate E.K. as an alternate juror, after initially indicating his concern during the bench conference, sufficiently preserved this issue for review and we treat this objection the same as one to remove a juror for cause.

**2.** This guarantee applies to the states through the Fourteenth Amendment's Due Process Clause. *Duncan v. Louisiana*, 391 U.S. 145, 157–58, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

juror who is truly equivocal with regard to his or her ability to render an impartial judgment."). When asked by the trial court whether his prior relationship with one of the victims' brother would affect his ability to come to an unbiased verdict, E.K. responded: "I doubt it." When told by the trial judge that his response was not sufficient, E.K. warned that "it would be better to let somebody else serve it."

■ The trial court, in response to E.K.'s wish not to serve, told him "that can't be done." Only after this exchange did E.K. unequivocally state that he could come to an impartial verdict. Thus, the trial court failed to properly determine whether E.K. was, in fact, impartial, as E.K.'s responses to the trial court and counsels' questions were tainted by the trial court's implicit assertion (and corresponding pressure) that he was required to serve.[3] Moreover, E.K.'s close relationship with a victim's brother makes his initial desire not to serve even more troublesome. Having weighed the questions judiciously, we conclude that the trial court abused its discretion by ultimately failing to remove Juror E.K. from the panel.

■ Furthermore, this error cannot be deemed harmless. *Shane*, 243 S.W.3d at 341 ("Harmless error analysis is simply not appropriate where a substantial right is involved."). Thus, the trial court committed reversible error by failing to remove E.K. from the jury.[4]

Appellant's remaining allegations of error are either trial-specific or not properly preserved for our review.[5] Having already found cause to reverse, we will not address them.

## III. CONCLUSION

For the foregoing reasons, we reverse Appellant's convictions for murder and first-degree arson, vacate his sentence, and remand this matter to the Clay Circuit Court for a new trial consistent with this opinion.

MINTON, C.J., ABRAMSON, CUNNINGHAM, NOBLE, and VENTERS, JJ., sitting. MINTON, C.J., ABRAMSON, NOBLE, and VENTERS, JJ., concur. ABRAMSON, J., also concurs by separate opinion in which MINTON, C.J., NOBLE, and VENTERS, JJ., join. CUNNINGHAM, JJ., dissents by separate opinion.

ABRAMSON, J., Concurring.

I concur fully and write simply to emphasize that this Court never takes lightly its duty of review, a duty that is particularly heavy in a case such as this one, which involved the deaths of five people, weeks of trial and resulting sentences of life without

---

3. We acknowledge that a juror may be rehabilitated by subsequent questions. *Shane*, 243 S.W.3d at 338. However, "[t]here is no 'magic question' that can rehabilitate a juror as impartiality is not a technical question but a state of mind." *Id.* Here, we cannot say that E.K. was properly rehabilitated because the trial court tainted his responses to its questions by essentially telling him that he was required to serve.

4. Appellant made no allegations that the juror's service on the panel had, in fact, tainted other jurors, so we need not explore that issue.

5. Specifically, we note that Appellant failed to properly preserve his current allegation that the trial court erred by failing to suppress his confession. As this issue was not properly preserved for our review, we would be limited to reviewing it under the palpable error standard. RCr 10.26. Since Appellant does not request palpable error review of this issue and because we do not believe it would be helpful upon retrial for us to do so, we decline to address it.

parole on three counts of murder as well as a sentence of fifty years for arson. This trial and verdict were undone by one simple yet serious mistake. Perhaps the most time-worn statement from lawyers and judges alike to prospective jurors who are being questioned is "There are no right or wrong answers to these questions—just truthful ones." When the juror at issue was asked by the court point-blank to search his heart and mind and state whether yes, he could be impartial or no, he could not be impartial, he answered truthfully that it would be better to let someone else serve. While certainly not the most direct way of phrasing his conclusion, it was clear that upon reflection the juror did not believe he could be impartial. As he had explained, years earlier when the juror was a teenager, the brother of Amanda Sturgill, the adult female victim and mother of the three young children who were killed, had lived with the juror and his family. To this truthful answer the trial court unequivocally stated "That (someone else serving) can't be done." In short, the judge told the juror the answer was wrong. As the majority notes, it was the trial court that was wrong and this error undeniably tainted the exchange that came after. While it is always concerning to lose a juror early in a trial after days and days of jury selection, a juror's sincere expression of grounds for disqualification cannot be ignored as the "wrong" answer regardless of when it is given. It is all the more regrettable in this case that a final opportunity to correct the error was lost when there was no agreement to designate the juror as an alternate and dismiss him prior to adjournment for jury deliberations.

MINTON, C.J.; NOBLE, SCOTT, and VENTERS, JJ., join.

CUNNINGHAM, J., Dissenting.

With upmost respect for members of the majority, I strongly dissent.

In early February 2004, the Appellant wiped out the family of Chris and Amanda Sturgill. This included them and their three little sons, Michael, Robert and Jordon. The small children were asphyxiated in their sleep. Their parents were killed by bow and arrow and their home burned to the point that Amanda was unrecognizable.

After a twelve-day-long trial in Clay County, on change of venue from Leslie County, Appellant was convicted for the murders of the children and of arson in the first degree. The jury was unable to reach a verdict on the deaths of Chris and Amanda. A sentence of life without parole was imposed.

The trial court guided this death penalty case through almost two weeks of trial. A change of venue, individual voir dire, numerous motions and rulings, and a myriad of witnesses culminated in final instructions and a verdict. Yet, this Court second guesses the trial judge on one solitary issue to send this case back to be tried again. The convictions for these merciless crimes of infanticide have been set aside because we deem the trial court abused its discretion in not excusing for cause one juror.

For us to find the trial court abused its discretion, we must find that its decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999). *See also Sanders v. Commonwealth*, 801 S.W.2d 665 (Ky.1990) (Trial court did not err in refusing to strike juror for cause who had a current, casual business relationship with the victim. Juror also stated that he "liked" the victim.); *Wood v. Commonwealth*, 178 S.W.3d 500

(Ky.2005) (Trial court did not err in refusing to strike juror for cause who went to junior high school with victim. Juror stated that it had been "years" since she had last seen victim.); *Dillard v. Commonwealth*, 995 S.W.2d 366 (Ky.1999) (Trial court did not err in refusing to strike juror who was a fireman and victim was the fire chief. The juror and the victim worked different shifts and had not discussed the case.); *Derossett v. Commonwealth*, 867 S.W.2d 195 (Ky.1993) (Trial court did not err in refusing to strike juror who lived on the same street as victim's family and knew the victim's sisters "pretty well.")

The brother of one of the victims had lived with the juror's family some twelve years before. This distant association of a relative of one of the victims failed to solicit the slightest concern through extensive individual and general voir dire.

Only after fourteen jurors were seated did he recall the relationship with the brother of one of the victims some twelve years before. Conscientiously, the juror approached the judge in the hallway. Appropriately, the judge took it up at the bench with him and the attorneys. "I just wanted you to know that I knew him," the juror explained. His answers, when taken as a whole, clearly show that the prior relationship would not affect his deliberation.

Almost at the end of the judge's very considerate and balanced questioning, he asked the juror: "So if the case turned out just like she (defense lawyer) said in her opening; if it turns out that that's the proof and you say he ain't guilty, you can find him not guilty and not cause you any problem? Juror: "Yeah."

Untutored and inexperienced jurors are often placed in the uncomfortable position of trying to answer confusing and hypothetical questions thrown at them by lawyers and judges. We have repeatedly

stressed that a trial judge must assess the *totality* of a prospective juror's responses. *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky.2007). Just as there are no "magic" words to rehabilitate a juror, there should be no "magic" words that automatically disqualify a juror. The juror's demeanor and sincerity should be taken in account by the trial judge as much as the actual content of what they are saying. It is impossible for appellate judges to do as well. *Adkins v. Commonwealth*, 96 S.W.3d 779 (Ky.2003).

The juror did say it would be better to get someone else to serve in his place. Who wouldn't want another juror to take his place in a death penalty case? The judge correctly told him he couldn't do that. There were no jurors to replace him as only the fourteen selected remained in the courtroom. If a preference not to serve constituted grounds to strike for cause, there would be no one left to serve on our juries.

Interestingly, and perhaps telling, the jury failed to convict the Appellant for the death of Amanda, the brother of whom was the person the juror had some relationship with a dozen years before.

The record very fairly supports the conclusion that the juror was simply conscientious. He came forward not to ask the judge to be excused, nor even to express doubt about his ability to serve fairly and impartially. He simply belatedly remembered a faraway relationship and wanted to clear his conscience. Were all jurors so disciplined, our justice system would be more just. In the objective evaluation of a trial judge there on the ground looking the juror in the eye and listening to the nuances of the voice, and especially the equivocation of the defense lawyer, there was no abuse of discretion. "The trial judge properly may chose to believe those

statements that were the most fully articulated or that appeared to have been least influenced by leading." *Mabe v. Commonwealth*, 884 S.W.2d 668, 671 (Ky.1994) (quoting *Patton v. Yount*, 467 U.S. 1025, 1038–39, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)).

Even the defense lawyer had limited concern about the juror's ability to serve. After the questioning by the judge and the lawyers, she did not move for the juror to be struck for cause. The attorney only reserved her right to request the designation of the juror as an alternate to be struck near the end of the trial when alternates are pulled. As we will see, the criminal rule dealing with alternates does not allow this late challenge.

The trial court was nothing, if not conscientious, in this case. In no way did the judge act "arbitrarily, unreasonably, or unfairly." In addition to his painstaking inquiry of the jury in question, he pondered studiously the proper method of excusing alternates in criminal cases. Just prior to the alternates being struck at the end of the case and in pondering his options, he read out loud in open court the pertinent part of RCr 9.32(1). It reads in part:

> If the membership of the jury exceeds the number required by law, the alternate juror or jurors may be designated by agreement of the parties and the Court; otherwise, immediately before the jury retires to consider its verdict, the clerk, in open court, *shall* by random selection reduce the jury to the number required by law. (Emphasis added.)

There are only two ways to pick the alternates to be struck. First is by agreement. There was no agreement in this case. The other is by random selection. Under the rule, at that point of the trial, the trial court had no choice but to pull two jurors at random. Absent an agreement the rule does not allow for the selection of an alternate to be struck by name.

After reading the rule, the court invited comments by both sides. There was rather vague recollection by the attorneys of even what the juror had said nineteen days before. "To be very cautious, he did have some kind of relationship with the victim's family," explained counsel for Appellant in requesting that the juror be dismissed as one of the alternates.

The judge did not cite the rule in denying the request of Appellant's counsel. But he was in compliance with the rule by denying the motion to strike the juror for cause at this stage of the proceeding. This can hardly be considered an abuse of discretion. In denying the request to strike the juror in question, the trial court said, "He said it would have no effect and he just wanted us to know." To this conclusion, counsel for Appellant agreed, "That's correct. He said he could sit."

We should not second guess the trial judge on such an encounter and reverse this very serious case. Justice is not served when we reverse the trial of a mass murderer on such a thin reed of speculation.

I respectfully, but strongly, dissent.