Shelby LITTLE, Jr., Appellant

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2011–SC–000628–MR.

Supreme Court of Kentucky.

Dec. 19, 2013.

Rehearing Denied March 20, 2014.

Shannon Renee Dupree, Assistant Public Advocate, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, David Bryan Abner, Assistant Attorney General, Counsel for Appellee.

Opinion of the court by Justice ABRAMSON.

Shelby Little, Jr. appeals as a matter of right from a judgment of the Meade Circuit Court sentencing him to a 70–year prison term for two counts of first-degree assault, first-degree wanton endangerment, operating a motor vehicle under the influence of alcohol, driving without an operator's license, and being a persistent felony offender in the first degree. On appeal, Little first claims that the trial court violated his due process right to a fair trial by failing to remove two jurors for cause. Second, Little argues that his right to confrontation was violated by the introduction of a hospital laboratory report without the testimony of the author. Finally, Little asserts that the wanton endangerment conviction violated the constitutional prohibition on double jeopardy and his right to a unanimous verdict. After review, we affirm except as to Little's conviction for wanton endangerment, which we reverse as explained fully herein.

### FACTS

On the afternoon of August 9, 2004, Shelby Little's truck crossed over the center line of a roadway in Meade County and collided with a vehicle driven by Angela Sosh. Ms. Sosh and her passengers, her two-year-old son Nathan Hamill and sixteen-year-old Courtney Moon, all suffered injuries as a result of the accident. Little, who was also injured, was taken to the hospital where he was treated and where the Kentucky State Police ("KSP") executed a search warrant to draw Little's blood in order to perform a toxicology screening.

The test results indicated that Little had a blood alcohol level of .29%.

Little was indicted for three counts of first-degree assault, first-degree wanton endangerment, operating a motor vehicle under the influence ("DUI"), driving with no insurance, driving without a license, and persistent felony offender in the first degree. His 2007 trial ended with a Meade County jury convicting Little of all charges. On appeal, this Court reversed Little's convictions and sentence on the basis of the trial court's failure to properly instruct the jury on second-degree assault as to Sosh and the erroneous introduction of evidence of Little's four prior DUI convictions.[1]

Little's second trial began on July 25, 2011. The trial court directed a verdict of acquittal on the first-degree assault charge as to Courtney Moon, and also on the driving with no insurance charge. The jury found Little guilty on all remaining counts and recommended a total sentence of 105 years but the trial court imposed the maximum sentence of 70 years pursuant to Kentucky Revised Statute ("KRS") 532.110(1)(c).

## ANALYSIS

### I. The Trial Court's Refusal to Strike Two Jurors Was Not an Abuse of Discretion.

■ Little's first allegation of error is that the trial court abused its discretion when it failed to strike two jurors for cause, forcing him to remove those jurors by using peremptory challenges. A juror whom Little would have stricken sat on the jury. In *Shane v. Commonwealth,* this Court declared that a trial court's erroneous failure to excuse a juror for cause necessitating the use of a peremptory strike is reversible error. 243 S.W.3d 336 (Ky.2007). We must thus determine if the trial court abused its discretion when it refused to remove the challenged jurors for cause.[2] *Adkins v. Commonwealth,* 96 S.W.3d 779 (Ky.2003); *Pendleton v. Commonwealth,* 83 S.W.3d 522 (Ky.2002).

During *voir dire,* the Commonwealth asked the panel members if anyone in their immediate family had been a victim of drunk driving. Potential Juror Wright answered in the affirmative and disclosed that her husband, mother, and younger sister had been killed in two separate accidents caused by drunk drivers. When asked if she could serve on the jury knowing that the case involved a drunk-driving charge, Juror Wright replied that she could, explaining that the individuals who had killed members of her family "had served their time" and that Little's case was a "separate case." When pressed, she said, "He's not the person who did it to my family." Later she said, "it's two totally different persons." Juror Wright further asserted that she could remain fair and impartial, and that she could follow the court's instruction in fixing a penalty. Little moved to strike Juror Wright for cause, arguing that she could not possibly set aside her personal circumstances despite the fact that she claimed that she could be

---

1. *See Little v. Commonwealth,* 2007–SC–000610–MR, 2009 WL 1110336 (Ky. Apr. 23, 2009).

2. In *Gabbard v. Commonwealth,* 297 S.W.3d 844 (Ky.2009), we concluded that in order to bring a claim under *Shane,* the complaining party must, in addition to exhausting all peremptory strikes, "identify on his strike sheet any additional jurors he would have struck." *Gabbard,* 297 S.W.3d at 854. On his strike sheet, Little indicated that he would have stricken three additional jurors had he had more peremptory challenges at his disposal. One of the designated jurors ultimately sat on the jury. Therefore, Little complied with the preservation standard set forth in *Gabbard. Id.*

impartial. The trial court denied the motion.

Later, Juror Thompson was called to the bench to discuss how his experience as a first-responder in adjacent Hardin County would affect his ability to hear the case, if selected. Juror Thompson admitted to having encountered many victims of drunk-driving accidents over the course of his career, and that he believed that drunk-driving laws could be stricter. When asked if his experiences or beliefs would affect his impartiality, Juror Thompson stated that he would have to hear the evidence before he could make a decision regarding Little's case. When asked if he could impose the minimum sentence, he first replied, "I don't know." He later said, "Like I said, I don't know all the particulars of this case. I would have to give them what the law says in this case." Juror Thompson stated that his personal beliefs would not influence his judgment. Little's counsel moved to strike Juror Thompson for cause, characterizing his answers as indicative of an attempt to secure his presence on the jury. The trial court denied the motion. As noted, Little exercised peremptory strikes against Jurors Wright and Thompson so neither actually served on his jury.

 A potential juror must be excused on the basis that he or she is unqualified for service if there are reasonable grounds to believe that the juror could not render a fair and impartial verdict. Kentucky Rules of Criminal Procedure ("RCr") 9.36. In ruling on a motion to strike a juror for cause, a judge must make a determination of the juror's ability to serve based on the entirety of his responses. *Shane*, 243 S.W.3d at 338. This undertaking includes an assessment of both the content of all of the juror's responses, as well his demeanor and candor. *Id.; Moss v. Commonwealth*, 949 S.W.2d 579, 581 (Ky.1997). There are occasions when, despite the juror's answers, a juror's "familial, financial or situational" relationship with the parties will be sufficient to sustain a motion to strike for cause, where such relationships are likely to "subconsciously affect [the juror's] decision in the case." *Marsch v. Commonwealth*, 743 S.W.2d 830, 833–34 (Ky.1987) (citing *Ward v. Commonwealth*, 695 S.W.2d 404 (Ky. 1985)). However, this Court has consistently held that the mere fact that a juror or her family member has been the victim of a crime similar to the one charged against the defendant does not, in and of itself, justify that juror's excusal. *Brown v. Commonwealth*, 313 S.W.3d 577, 598 (Ky.2010) (juror victim of burglary); *Richardson v. Commonwealth*, 161 S.W.3d 327, 330 (Ky.2005) (juror victim of sexual abuse); *Woodall v. Commonwealth*, 63 S.W.3d 104, 118 (Ky.2001) (juror sister of rape victim); *Hodge v. Commonwealth*, 17 S.W.3d 824 (Ky.2000) (citing several earlier cases holding similarly). In those cases, additional evidence of bias is required, with "[o]bvious factors bearing on the likelihood of bias [being] the similarity between the crimes, the length of time since the prospective juror's experience, and the degree of trauma the prospective juror suffered." *Brown*, 313 S.W.3d at 598. Ultimately, "[i]t is the totality of all the circumstances, however, and the prospective juror's responses that must inform the trial court's ruling." *Id.*

In *Brown v. Commonwealth*, this Court held that the fact that a prospective juror was the victim of a burglary one year earlier did not automatically warrant the juror's removal from a burglary-murder prosecution. *Id.* The juror in *Brown* explained that a year had passed since the incident, and asserted that she could base her decision exclusively on the evidence presented. *Id.* In *Dunn v. Commonwealth*, we held that a trial court did not abuse its discretion when it declined to remove a juror whose daughter had been

sexually abused about eight years earlier. 360 S.W.3d 751 (Ky.2012). Although the defendant in *Dunn* had been charged with sodomizing a teenage boy, the Court concluded that there was "no additional evidence of bias that would necessitate disqualification" of the challenged juror where he "candidly answered questions from the judge, the prosecutor, and defense counsel," professing to be impartial and unbiased. *Id.* at 771.[3]

■ We are satisfied that Juror Wright's answers were sufficient to withstand a motion to strike for cause, as she explained that her personal tragedies would not affect her ability to listen to the evidence, follow the court's instructions, and render a fair and impartial verdict. *But cf. Paulley v. Commonwealth,* 323 S.W.3d 715 (Ky.2010) (reversible error occurred when the trial court failed to remove a juror for cause after the juror, a mother of a crime victim, admitted that she was unsure if she could remain unbiased given her personal history). Moreover, Ms. Wright did not share any personal, financial, or situational relationships with the parties in the case that would subconsciously undermine her professed impartiality. *But cf. Fugate v. Commonwealth,* 993 S.W.2d 931, 938 (Ky.1999) (ju-

ror shared professional relationship with prosecutor); *Ward v. Commonwealth,* 695 S.W.2d at 404 (juror was uncle to Commonwealth's Attorney); *Hayes v. Commonwealth,* 458 S.W.2d 3 (Ky.1970) (juror was brother to sheriff who would testify at trial).

Like the potential jurors in *Brown* and *Dunn,* Juror Wright was unequivocal in her ability to remain unbiased.[4] Moreover, a significant amount of time (26 years and 16 years, respectively) had elapsed between the deaths of her family members and the time of Little's trial.[5] *See Richardson v. Commonwealth,* 161 S.W.3d at 330 (no abuse of discretion when trial court allowed a juror to remain on the panel in sexual abuse case despite the fact that the juror had been sexually abused fourteen years earlier). Perhaps because she was not asked, she did not expound upon the exact details of the drunk driving accidents involving her family members, nor did she divulge the level of trauma she experienced. Juror Wright did, however, emphasize that Little was a "totally different person" and that his situation represented a "separate case." She also explained that the drunk drivers who killed her family members had "served their time" and "that was that."[6] When asked

---

**3.** The *Dunn* Court stated unequivocally, "Sexual abuse of a child is a crime that creates strong emotions." 360 S.W.3d at 771. The same can be said of drunk driving that causes death or injury but the *potential* for strong emotions based on past experience is never dispositive.

**4.** In his brief to the Court, Little quotes from a dissenting opinion in the unpublished case styled *Ballard v. Commonwealth,* 2010–SC–000094–MR, 2012 WL 601215 (Ky. Feb.23, 2012). Not only is Little's reliance on an unpublished opinion disallowed by our rules, Civil Rule ("CR") 76.28(4)(c), it is misplaced. The challenged juror in *Ballard* was a former police officer who had obtained "inside knowledge" of the case from an investigating officer. In the present case, neither Juror

Wright nor Juror Thompson shared any relationship with any of the parties in Little's trial.

**5.** Juror Wright's husband was killed by a drunk driver in 1985; her mother and sister were killed in 1995.

**6.** The dissent's reliance on the "magic question" line of cases is misplaced. Juror Wright was unequivocal in her *voir dire* responses and was never in need of so-called "rehabilitation." *See Montgomery v. Commonwealth,* 819 S.W.2d 713 (Ky.1991). Furthermore, the dissent ignores the fact that the challenged jurors in *Jackson v. Commonwealth,* 392 S.W.3d 907 (Ky.2013), *Grubb v. Norton Hospitals, Inc.,* 401 S.W.3d 483 (Ky.2013), *Paulley,* and *Fugate,* unlike Juror Wright, were unable

about assessing a penalty, Juror Wright stated that she could follow the court's instructions and could consider the full range. On this record, the trial court simply did not abuse its discretion as to Ms. Wright.

The dissent rejects our conclusion regarding Ms. Wright and would deem her unqualified due to her life experience, regardless of her responses in *voir dire*. This categorical disqualification reflects a paternalistic approach to the issue that, while understandable, is simply wrong. Many people who have been victimized by crime have found themselves able to forgive the perpetrator, hence the growth of the restorative justice movement in this country. Hadar Dancig—Rosenberg & Tali Gal, *Restorative Criminal Justice*, 34 Cardozo L.Rev. 2313, 2314–15 (2013). Many of those who have not reached that conclusion regarding their own experience are nonetheless able to distinguish between their personal situation and a totally separate case, just as Ms. Wright clearly did. It is a dangerous precedent to suggest that life experience alone disqualifies a juror. Tens of thousands of Kentucky families are affected by drug addiction, with one or more loved ones' lives destroyed and, frequently, the destruction is current and ongoing. The dissent's position is just one step removed from deeming all of those individuals unfit to serve in drug-related cases, a significant portion of any docket. In some Kentucky counties, that would result in disqualification of many, if not most, of the jurors summoned for service. Categorical disqualifications, finally, ignore that people are different. While judges should never abdicate their responsibility to strike a juror when circumstances clearly require it, judges must make an individualized decision with respect to the qualifications of a specific juror, giving due deference to a credible to unequivocally maintain an ability to remain

juror's own assessment of how her life's experiences, however tragic they may be, would influence her ability to serve fairly and impartially.

■ We also agree that the trial court did not abuse its discretion in refusing to remove Juror Thompson for cause. Juror Thompson, an emergency medical technician, admitted that he did not think that drunk-driving laws were "strict" enough. Little has seized upon this one answer on appeal, proclaiming it to be evidence of bias. However, Juror Thompson explained unhesitatingly that his opinion concerning DUI laws would "not make a difference," and that he would "have to hear the evidence" before he could make a decision. When asked if he could consider the full penalty range, Juror Thompson replied, "I don't know," but then clarified his answer by explaining: *"Like I said,* I don't know the particulars in this case." Thompson insisted that the facts of the case would be the basis for his decision. In assessing a potential juror's impartiality, "the test is not whether a juror agrees with the law when it is presented in the most extreme manner," but is "whether, after having heard all of the evidence, the prospective juror can conform his [or her] views to the requirements of the law and render a fair and impartial verdict." *Stopher v. Commonwealth,* 57 S.W.3d 787, 797 (Ky.2001) (*quoting Mabe v. Commonwealth,* 884 S.W.2d 668, 671 (Ky.1994)). Clearly, Juror Thompson's unwillingness to reveal what penalty he believed was appropriate was related to his desire to first hear all of the evidence.

Given the totality of the responses from Jurors Wright and Thompson, we cannot discern that either was biased or prejudiced and therefore unable to serve. The trial court did not abuse its discretion impartial.

when it refused to remove these jurors for cause and, consequently, Little was not improperly deprived of his peremptory strikes.

## II. The Hospital Laboratory Report Was Properly Admitted.

Little's second claim of error arises from the introduction of a clinical laboratory report into evidence. As noted above, KSP executed a search warrant for Little's blood some three hours after the accident and obtained a toxicology report. There is no dispute that the KSP toxicology report was properly admitted during the testimony of the report's author. Little challenges the admission of an earlier laboratory report based on blood drawn when he arrived at the hospital for treatment. This four-page report, created by the University of Louisville Hospital, is a comprehensive blood analysis report that contains, among other things, information regarding Little's blood alcohol level shortly after his hospital admission. This report was admitted over Little's objection that it was hearsay and not properly certified. Little now contends that the trial court's refusal to exclude the evidence was a violation of his Sixth Amendment right of confrontation as the hospital laboratory report was introduced without the testimony of the person who prepared it.

Before we begin our analysis of the substantive issue, we first address whether Little's objection was sufficient to preserve the error for appellate review. "It has long been the law of this Commonwealth that an error will not be reviewed on appeal if the trial court has not had an opportunity to rule on the objection." *Commonwealth v. Petrey*, 945 S.W.2d 417, 419 (Ky.1997) (internal citations omitted).

Kentucky Rule of Evidence ("KRE") 103(a)(1) provides that an error in admitting evidence will be preserved if "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]"

The hospital laboratory report was the subject of two hearings. At the first hearing, Little moved to suppress the report on the basis that the medical reports include "narratives" that may amount to inadmissible hearsay.[7] Little expanded the argument during the second hearing by attacking the "integrity" of the file, contending that the envelope containing the report had been sealed and unsealed multiple times. The Commonwealth maintains that Little's objections to the report were insufficient to preserve the error which he now presents for appellate review, while Little contends that the Confrontation Clause was implicated by the hearsay objection, and the fact that he did not specifically object on that basis does not render the challenge unpreserved. As it turns out, whether the objection was sufficient to preserve a Confrontation Clause objection is irrelevant.

Unlike the admissibility of nontestimonial hearsay, which is governed by our rules of evidence, "[t]he Sixth Amendment prohibits the admission of a testimonial statement of a declarant who does not appear at trial, unless ... the defendant had a prior opportunity for cross examination." *Roach v. Commonwealth*, 313 S.W.3d 101, 111 (Ky.2010). Following a line of United States Supreme Court cases including the seminal *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), this Court has de-

---

7. The argument was encompassed in a pretrial motion to suppress "all medical records," wherein Little argued: "Medical records are replete with hearsay, unsubstantial and inaccurate descriptions, and information that a layman is subject all too easily to misinterpretation [sic]."

clared that the admission of a forensic laboratory report without the live testimony of the report's author is a violation of the defendant's right to confrontation. *Whittle v. Commonwealth*, 352 S.W.3d 898 (Ky.2011); *see also Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009); *Bullcoming v. New Mexico*, —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). On appeal, the Commonwealth concedes that the introduction of the report in the absence of the report's author [8] violated Little's confrontation rights under *Crawford* and its progeny. 541 U.S. 36, 124 S.Ct. 1354. However, after careful review of the record and the relevant precedent, we conclude that the admission of the hospital laboratory report does not implicate the Confrontation Clause.

The Supreme Court's post-*Crawford* decisions in *Melendez–Diaz v. Massachusetts* and *Bullcoming v. New Mexico* distinguished between testimonial medical records and records intended for medical treatment. In *Melendez–Diaz*, the Supreme Court analyzed the admissibility of affidavits reporting the results of a forensic drug test. 557 U.S. at 307, 129 S.Ct. 2527. The Court found forensic reports prepared for trial to be "testimonial" but "medical reports created for treatment purposes" to "not be testimonial under our decision today." *Id.* at 362, n. 2, 129 S.Ct. 2527. Justice Sotomayor's concurring opinion in *Bullcoming v. New Mexico* expanded upon the importance of this delineation: "When the 'primary purpose' of a statement is 'not to create a record for trial,' *ibid.*, 'the admissibility of [the] statement is the concern of state and federal rules of evidence, not the Confrontation Clause.'" 131 S.Ct. at 2720 (*quoting Michigan v. Bryant*, 562 U.S. ——, ——, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011)). The concurrence further explained that, "[t]o determine if a statement is testimonial," we must decide whether it has "a primary purpose of creating an out-of-court substitute for trial testimony." *Id.*

In Little's case, the hospital laboratory report reflects scientific data regarding the levels of various chemicals in his blood, and, unlike a nurse's or doctor's notes, contains no narrative statements about the patient. The record establishes that Little was treated at University Hospital for injuries he received in the collision, including emergency surgery for a fractured femur. This comprehensive blood analysis report was clearly intended for the primary purpose of providing that medical treatment to Little, and was not intended to establish or prove a fact or serve as a "substitute for trial testimony." *See Bullcoming*, 131 S.Ct. at 2720. As such, the admissibility of the hospital report is governed by the Kentucky Rules of Evidence ("KRE"), and not by the Confrontation Clause.

■■■ Business records of regularly conducted activities, such as medical records, are subject to an exception to the hearsay rule under KRE 803(6). *See Matthews v. Commonwealth*, 163 S.W.3d 11, 26 (Ky.2005) ("Medical records like those in this case generally fall under the business records hearsay exception embodied in KRE 803(6)."). A medical record must first pass the authentication requirements before it can be admitted under the hearsay exception. *See James v. Commonwealth*, 360 S.W.3d 189, 201 (Ky.2012) ("So long as the authentication requirements are met, medical records are normally admissible as business records under KRE 803(6)."). Typically, the testimony of "the custodian or other qualified witness" is a foundational re-

---

8. The Commonwealth introduced the hospital laboratory report through the testimony of its expert Dr. Greg Davis. Dr. Davis was not the author of the report.

quirement for the admission of a medical record under the business records exception. KRE 803(6)(A). However, a medical record will qualify as self-authenticating when it "consists of medical charts or records of a hospital that has elected to proceed under the provisions of KRS 422.300 to 422.330[.]" KRE 803(6)(A). In this case, the hospital laboratory report in question was part of Little's medical records that had been properly certified for the original trial by University of Louisville Hospital's Custodian of Records pursuant to KRS 422.305(2). At the second trial, Little insisted that a newly-certified copy of the report must be obtained, arguing that the Commonwealth could not seek to admit the original copy because the report was never actually admitted into evidence in the first trial. The trial court overruled the objection, stating that records certified for the original trial did not need to be re-certified for the second trial.

We find no error in the trial court's ruling, as there is nothing in the record to suggest that the hospital report was either tampered with or that the chain of custody was disrupted. The prosecutor represented to the trial court that the report remained sealed within Little's medical records in the trial court's possession until it was sent to this Court for Little's first appeal. The Commonwealth's witness who testified about the report identified it as a "clinical laboratory report from the University of Louisville Hospital," and there was absolutely nothing to suggest that the report had been tampered with in any manner. *See* KRE 901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). In sum, the hospital laboratory report was properly admitted as a business record pursuant to KRE 803(6). The testimony of the person who

prepared the report was not required because the report was not testimonial and Little's confrontation rights were not violated by its admission. The report was a business record properly certified under KRS 422.305(2), and the trial court did not err in admitting it.

### III. Prosecution of a Wanton Endangerment Charge As to Albert Logsdon Violated Little's Double Jeopardy Rights And the Wanton Endangerment Instruction Violated His Unanimous Verdict Right.

As his final issue on appeal, Little challenges his conviction of wanton endangerment as to Deloris Ray and/or Albert Logsdon. Both Ms. Ray and Mr. Logsdon were driving in the vicinity on the day of the accident. Mr. Logsdon was a passenger in his grandfather's truck; his grandfather was forced to swerve and slam on his brakes when Little entered the highway. Ms. Ray was driving toward Little when he began to cross the center line of traffic, forcing her car off the road. Little was indicted for various offenses arising from the 2004 accident, including one count of wanton endangerment in the first degree. Little's indictment read:

> Count IV: That on or about August 9, 2004, in Meade County, Kentucky, the Defendant, Shelby R. Little, Jr., committed the offense of Wanton Endangerment in the First Degree, when he, manifesting extreme indifference to human life, wantonly engaged in conduct which created a substantial danger of death or serious physical injury to Deloris Ray and/or Albert Logsdon, and/or other persons on the highway, and against the peace and dignity of the Commonwealth of Kentucky.

At the conclusion of the first trial, the jury was instructed on wanton endangerment in the first degree as to Ms. Ray

only, for which the jury found Little guilty. Little's convictions were reversed by this Court on the basis of the erroneous introduction of prior DUI conviction evidence and the trial court's failure to include instructions on second-degree assault. At the second trial, essentially the same proof was presented, but this time the trial court instructed the jury on wanton endangerment as to "Deloris Ray and/or Albert Logsdon." The jury found Little guilty of wanton endangerment in the first degree.

■■■ Little asserts that the first jury's conviction of wanton endangerment as to Ms. Ray operated as an implicit acquittal of his wanton endangerment charge as to Mr. Logsdon, and, therefore, the subsequent prosecution for wanton endangerment as to Mr. Logsdon was a violation of the Double Jeopardy Clause of the Fifth Amendment. Although Little failed to raise this issue at trial, the matter is properly presented for this Court to consider as "the constitutional protection against double jeopardy is not waived by failing to object at the trial level." *Walden v. Commonwealth*, 805 S.W.2d 102, 105 (Ky.1991) (*overruled on other grounds by Commonwealth v. Burge*, 947 S.W.2d 805 (Ky. 1996)).

■■■ The Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" Section 13 of the Kentucky Constitution guarantees the same right, and together these clauses protect a criminal defendant against repeated prosecution for the same offense following an acquittal or conviction on that offense. *Hourigan v. Commonwealth*, 962 S.W.2d 860, 862 (Ky. 1998). In the typical case, an appellant asserts double jeopardy protection concerning a charge that has been reversed by an appellate court, necessitating a determination as to whether the reversal was for insufficient evidence or trial error.

The former, insufficient evidence, precludes retrial while the latter, trial error, does not implicate double jeopardy and does not preclude retrial. *Burks v. United States*, 437 U.S. 1, 15, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). *See also Commonwealth v. Davidson*, 277 S.W.3d 232 (Ky. 2009). Thus, whether convicted or acquitted of the charge, an appellant may seek to invoke the constitutional protection against a second prosecution prior to retrial. Unique to Little's appeal is the fact that the first jury failed to reach a verdict as to the charge relating to Mr. Logsdon because it was never specifically instructed on that charge. Simply put, Little was neither convicted nor acquitted of wantonly endangering Logsdon in the first trial.

■■■ Contrary to Little's assertion, this case cannot be resolved as an acquittal by implication. The "implied acquittal" component of double jeopardy was first recognized in *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), where the Supreme Court held that conviction of a lesser-included offense operates as an implied acquittal of the greater offense. As stated by this Court in *McGinnis v. Wine*, "the double jeopardy clause prohibits the prosecution or conviction for a greater offense when a defendant has already been tried and acquitted, or convicted, on a lesser-included offense." 959 S.W.2d 437, 438 (Ky.1998). Here, because the first jury never considered whether Little wantonly endangered Mr. Logsdon, the traditional elements of an implied acquittal are simply not present. Instead, we must examine the general principles of double jeopardy as they relate to Little's case.

Whether the interests protected by the Double Jeopardy Clause would be offended by retrial when an earlier jury was not asked to reach a verdict was addressed by the Sixth Circuit Court of Appeals in *Say-*

*lor v. Cornelius*, 845 F.2d 1401 (6th Cir. 1988). In *Saylor*, the defendant was indicted in a Kentucky state court on one count of murder, which encompassed three theories of liability: murder as principal, murder as an accomplice, and murder by conspiracy. 845 F.2d at 1402. At trial, the jury was instructed solely on murder by conspiracy. *Id.* The prosecution did not object to the conspiracy instruction, nor did it request an instruction on the other theories. *Id.* When our predecessor Court reversed the resulting conviction for insufficient evidence, the Commonwealth attempted to prosecute the defendant again using the accomplice theory of liability on retrial. *Id.* at 1403. On habeas review, the Sixth Circuit held that retrial on the accomplice theory violated the Double Jeopardy Clause. *Id.* at 1408–09. The *Saylor* Court concluded that the termination of the trial without a verdict was a result of the prosecution's failure to request an instruction on accomplice liability, and double jeopardy prohibits the government from "[proceeding] on several theories of liability throughout a trial" only to "[withhold] instructions on any one of them" in order to "reserve that theory for retrial at a later date." *Id.* at 1404.

The *Saylor* decision not only presents a compelling argument based on the overarching principles of double jeopardy protection, but the factual similarities between *Saylor* and the case at bar resonate. In fact, the Court explicitly contemplated a scenario nearly identical to Little's:

> [S]uppose a defendant is indicted and tried for the murders of Johnson and Williams. The defendant is in jeopardy of being convicted of both murders right up to the time the jury returns its verdict. If the judge instructed the jury on only one of the murders, and the other murder could be used as a second string to the prosecution's bow for later retrial, it would negate completely the basic intention of the Double Jeopardy Clause

that a person may not be tried again for the same offense when the prosecution has put him in jeopardy and the prosecution has terminated that jeopardy without result.

845 F.2d at 1404–05.

Having reviewed the record of the first trial, it is apparent that the Commonwealth, for whatever reason, omitted the wanton endangerment charge with respect to Mr. Logsdon at the instruction stage. However, the Commonwealth clearly presented the charge involving Mr. Logsdon, to the jury, referring to it in opening statement. The Commonwealth also called Logsdon to testify, where he described almost being struck by Little's vehicle while traveling as a passenger in his grandfather's truck. At the close of the Commonwealth's case-in-chief, Little moved for directed verdicts on all charges. In response, the prosecutor asserted that Commonwealth had offered sufficient proof to allow the jury to consider whether Little's behavior created a substantial danger of serious physical injury to Ms. Ray *and* Mr. Logsdon. The trial court denied the motions. Thereafter, Little's counsel tendered instructions on wanton endangerment as to Ms. Ray only. The Commonwealth did not object to the instructions in that respect, nor did it request an instruction including Logsdon as a victim.

We agree that "due to the prosecution's acquiescence in the instructions given, the prosecution should bear the burden of the aborted outcome." *Saylor*, 845 F.2d at 1407. As declared by the Supreme Court, "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials." *Burks v. United States*, 437 U.S. at 11, 98 S.Ct. 2141. Where the

Commonwealth presents evidence as to an offense and has placed that offense before the jury but neglects to seek an instruction, the result is the same. To allow the Commonwealth to tacitly approve of an instruction that omits a victim, only to prosecute the defendant for endangering the omitted victim on retrial obliterates double jeopardy's protection against multiple prosecutions.[9]

■ In sum, the Commonwealth's apparent abandonment of the wanton endangerment charge as to Logsdon and subsequent acquiescence in the instructions given precluded retrial of that offense under the Double Jeopardy Clause of the Fifth Amendment of the U.S. Constitution and Section 13 of the Kentucky Constitution. Little's subsequent conviction of wanton endangerment as to Albert Logsdon was a violation of his right to be free from successive prosecutions.

■ While the wanton endangerment charge as to Logsdon was barred by double jeopardy principles, retrial as to the charge involving Deloris Ray was not barred because the verdict in the first trial was reversed due to trial error, the aforementioned erroneous admission of Little's prior DUI convictions. Unfortunately, in the second trial the trial judge, confronted with a duplicitous indictment, gave a duplicitous instruction, *i.e.*, an instruction that combined two separate criminal offenses. *Johnson v. Commonwealth*, 405 S.W.3d 439 (Ky.2013). The wanton endangerment instruction allowed the jury to consider the endangerment of Logsdon, whose grandfather had to swerve and apply the truck's brakes to avoid being hit by Little, and then the endangerment of Ray slightly later in time and further down the road. Ray testified that she was forced to drive off the road to avoid Little, who had

crossed the center line and was travelling in her lane. These are two separate criminal acts and any instruction combining them runs afoul of our unanimous verdict jurisprudence. *Kingrey v. Commonwealth*, 396 S.W.3d 824 (Ky.2013). *Johnson*, 405 S.W.3d at 439. Such instructional errors which violate a defendant's right to a unanimous verdict are deemed palpable. *Kingrey*, 396 S.W.3d at 831–32; *Johnson*, 405 S.W.3d at 457. Thus the wanton endangerment conviction must be reversed. Once again the reversal as to the charge involving Ray is for trial error and thus under the teachings of *Burks*, 437 U.S. at 15, 98 S.Ct. 2141, the charge remains viable for retrial.

### CONCLUSION

For the reasons stated herein, Little's convictions for first-degree assault, operating a motor vehicle under the influence of alcohol, driving without an operator's license, and being a persistent felony offender in the first degree are affirmed. Little's first-degree wanton endangerment conviction and sentence are reversed and this case is remanded to the trial court for further proceedings consistent with this Opinion.

MINTON, C.J.; NOBLE, and VENTERS, JJ., concur.
CUNNINGHAM, J., dissents by separate opinion in which KELLER and SCOTT, JJ., join.

CUNNINGHAM, J., dissenting.

It is shocking to me that a juror who had suffered the agony of having a husband, mother, and sister killed by drunk drivers in two separate tragedies was not struck for cause from serving on this drunk-driving case. Consequently, the

---

9. We note that although it was Little's counsel who tendered an instruction omitting Mr. Logsdon from the charge, "the defense lawyer

hardly can be faulted for not having done the prosecutor's job." *Saylor*, 845 F.2d at 1407.

Appellant was deprived of a peremptory strike. Therefore, I must respectfully dissent.

In the landmark case of *Shane*, we recognized that when a trial judge fails to properly excuse a juror for cause, the criminal defendant must use one of the allotted peremptory strikes. In essence, such a failure of the trial court deprives the criminal defendant of a level playing field with the prosecution. We have also wisely addressed and condemned the practice of trial judges allowing tainted jurors to talk themselves back onto the jury by giving rote recantations to so called "magic questions." *Montgomery v. Commonwealth*, 819 S.W.2d 713, 717–18 (Ky.1991).

In *Montgomery*, our predecessor Court turned an important page in our judicial history of jury selection. We took the prerogative of who qualifies as a juror away from *what the juror says* and based it upon *who the juror is*. No longer can a prospective juror talk himself into a seat of judgment when his known experiences and personal situations are a scathing indictment of his qualifications. In that landmark decision of almost 23 years ago, we held that a juror's response to questioning was only one factor to be considered in determining his or her ability to be fair and impartial. In so holding, we stated that "[i]t makes no difference that the jurors claimed they could give the defendants a fair trial." *Id.* Our directive is clear: "We declare the concept of 'rehabilitation' is a *misnomer* in the context of choosing qualified jurors and direct trial judges to remove it from their thinking and strike it from their lexicon." *Id.* This sound reasoning is premised upon decades of precedent.

For example, we recognized in *Pennington v. Commonwealth*, that "[i]t is the *probability* of bias or prejudice that is determinative in ruling on a challenge for cause." 316 S.W.2d 221, 224 (Ky.1958)

(emphasis added). Similarly, in *Marsch v. Commonwealth*, we opined that "[jurors'] statements, given in response to leading questions, that they would disregard all previous information, opinions and relationships *should not have been taken at face value*." 743 S.W.2d 830, 834 (Ky. 1987) (emphasis added). *See also Tayloe v. Commonwealth*, 335 S.W.2d 556, 557 (Ky.1960) ("[T]he conditions were such that [the jurors'] connections would probably subconsciously affect their decisions of the case adversely to the defendants.").

*Pennington*, *Marsch*, and *Tayloe* "stand for the principle that objective bias renders a juror legally partial, despite his claim of impartiality.*" *Montgomery*, 819 S.W.2d at 718 (emphasis added). This principle cannot be overstated. It also bears repeating: "[T]he conditions were such that [the jurors'] connections would probably subconsciously affect their decisions of the case adversely to the defendants." *Tayloe*, 335 S.W.2d at 557. When our Court wrote these words, it had potential jurors like Juror Wright in mind.

The most critical part of a criminal trial is jury selection. That step in the proceeding—more than any other—determines whether an unbiased hearing will be given to both sides and a fair and impartial verdict rendered. For a trial judge, directing jury selection is an art. The decision whether to allow a juror to be struck for cause must be based on more than mere words given by the juror. It must be based on the totality of the circumstances and a strong grounding in common sense and a grasp of human nature. In *Montgomery*, some of the jurors had already formed an opinion about the case, but were allowed to stay on the jury when they gave ostensibly rehabilitative answers to rote questions. Here, we have an experience much more indelible and searing than preconceived opinions—the deaths of

not one, or two, but three close family members.

We have reversed criminal convictions in the past for much less cause. *See Jackson v. Commonwealth*, 392 S.W.3d 907, 914 (Ky.2013) (failure to designate juror as an alternate after uncovering that juror previously lived with victim's brother was reversible error); *Grubb v. Norton Hospitals, Inc.*, 401 S.W.3d 483, 486 (Ky.2013) (reversible error in failing to strike juror whose children were delivered by an expert medical witness); *Paulley v. Commonwealth*, 323 S.W.3d 715, 720 (Ky.2010) (reversible error in murder trial when the trial court failed to strike a juror who was a burglary victim and whose son was a robbery victim); *Fugate v. Commonwealth*, 993 S.W.2d 931, 939–38 (Ky.1999) (finding reversible error when trial court failed to strike juror who played Little League baseball and went to high school with a witness for the prosecution ten years before trial).

Justice Abramson, in her typically well-written opinion, states: "[T]his Court has consistently held that the mere fact that a juror or her family member has been the victim of a crime similar to the one charged against the defendant does not in and of itself, justify that juror's excusal." Several cases are cited to support this proposition. However, none of those jurors were brutally victimized by the permanent loss of a loved one, and certainly not several loved ones. We are talking here about the loss of three of the most precious kindred lives that human beings have—a spouse, a mother, and a sibling. These ruinous emotional scars are never healed in this lifetime, let alone in 16 years or 23 years.

In making his strenuous request for a strike for cause in this case, the defense lawyer correctly stated that it "would be very strange for her not to be affected" by her experiences. In pondering the request, the trial judge himself expressed amazement when referencing Juror Wright's background, commenting to the effect that he had never had a potential juror who had ever had this many family members killed by a drunk driver. It is obvious in watching the voir dire of Juror Wright that the trial judge totally surrendered his discretion to what the juror said without sufficient regard, if any, to the gravity of her experiences. The judge granted full absolution solely on the "magic answers."

I must also respectfully challenge the suggestion in footnote three of the majority opinion that the horrible experiences by Juror Wright create only the "*potential* for strong emotions based on past experience." Webster's Dictionary equates "potential" with "possible." Thankfully—for the well-being of human kind—only a mentally afflicted person would not have "strong emotions" upon suffering the loss of a spouse, parent, and sister.

Had this case been before us with a death penalty, and had a juror who had suffered the fate of three family members having been murdered not been stricken for cause, I hardly think the result expressed by the majority would have been the same. With great deference and respect, I ask my fellow justices—all of whom are much more learned than I—are we not establishing a troublesome precedent here?

I am not proposing a rule that potential jurors in Juror Wright's situation be automatically excused, or that the trial court has no discretion. I'm simply suggesting what death penalty litigators constantly proclaim: "Death is different." I think any juror who has suffered the tragedy of a family member having been killed by someone who has committed the same misconduct that he or she is now called upon to judge must be struck for cause. It

defies reality to think that a person of normal human sensibility and feeling could ever pass judgment upon a person charged with drunk driving without having his or her decisions affected by these terrible and searing personal experiences.

It would also serve us well to look at the larger picture of which this case is only a part. There are two types of jurors who will pose the issue before us. First will be those like Juror Wright. These are the well-intended persons who have answered the call to jury duty for the purpose of fulfilling a respected civic duty. In their efforts not to shrug from this responsibility, they give what in their minds are truthful answers. They draw upon the better angels of their nature by proclaiming their fairness and neutrality.

But the detached magistrate should know better. Reality dictates that it is an impossible task. In making his plea for a strike for cause, the defense attorney correctly projected this juror further along in the case. He pointed out to the judge that the graphic and heart-rending evidence of the child in this case being treated at the hospital would have to arouse painful recollections by Juror Wright—recollections and feelings which were obviously subdued at the time of voir dire. The lashes of a thousand pains cannot be ignored by good intentions.

More ominous is the other class of jurors—the ones who have not only suffered mightily and have not forgotten, but have also not forgiven. The call of jury duty in certain cases is an avenue for some to wreak vindication for their own pain. By giving full sway and unconditional credence to the assertions of such people, we give them a free pass to sit on the front row of what is to them a trial of personal retribution.

Ask a thousand people of average humanity and intelligence if a person who has had a husband, mother, and sister killed by a drunk driver should be allowed to sit on a drunk-driving case, the unanimous response would be a resounding and emphatic "no." Try to reassure this same sampling that this juror had declared that the nightmarish experiences would have no affect on her decisions and the response would still be "no way." These would be, in my opinion, smart people. Yet, the trial judge in this case thinks otherwise. I'm confident that none of my most capable and distinguished brothers and sisters on this Court, who were excellent trial judges, would have allowed this juror to sit. It is highly doubtful that, upon learning of her tragic experiences, they would have stretched this lady out upon the rack of painful remembrances by even questioning her further. I think it was clearly an abuse of discretion for this trial court to do so.

I, therefore, must respectfully dissent and would reverse and remand.

KELLER and SCOTT, JJ., join this dissent.