# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: FEBRUARY 18, 2016
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2014-SC-000378-MR

DATE 3-10-16 EwAGroutt D.C

DAVID GURLEY                                                                APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                          HONORABLE BARRY WILLETT, JUDGE
NO. 12-CR-003480

COMMONWEALTH OF KENTUCKY                                      APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING, IN PART, REVERSING, IN PART AND REMANDING

A circuit court jury convicted David Franklin Gurley, Jr., of Murder, four counts of second-degree wanton endangerment, two counts of criminal mischief, operating a motor vehicle while under the influence of intoxicants, and failure to maintain required automobile insurance. For these convictions, the trial court entered judgment sentencing Gurley to twenty-six years' imprisonment. Gurley argues on direct appeal that several trial errors require reversal of his convictions. We find Gurley's trial was fundamentally fair and affirm his convictions and associated sentence, reversing only the conviction for failure to maintain automobile insurance.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Gerald Goldsmith sat astride his motorcycle, sitting last in a long line of traffic waiting for the stoplight to turn green. Gurley, who had been drinking alcohol, approached Goldsmith from behind, driving his SUV under the posted

speed limit. As he approached, the stoplight turned green but the vehicles in the line ahead of Goldsmith had not yet begun to move. Gurley did not appear to lessen his speed—no skid marks were detected at the scene—and struck Goldsmith's motorcycle from behind. The force of the impact drove Goldsmith's motorcycle into the vehicle directly in front of him and sent him flying into the air. In essence, Gurley drove his SUV *through* Goldsmith's motorcycle his front bumper wedged under the car in front of Goldsmith; likewise, that car was wedged under the car directly in front of it. Goldsmith died from the injuries suffered in this crash.

Deborah Godsey witnessed the crash. She pulled her vehicle onto the median of the highway and began to check on those involved. After seeing Goldsmith's condition, she approached Gurley's vehicle to check on him. He responded by asking her for a light for his cigarette. Her silence in the face of this request apparently agitated Gurley as he forcefully repeated his demand. Deborah simply walked away.

Within minutes, police and emergency personnel arrived. Officers Brittin and Zimmerman arrived first. Officer Brittin approached Gurley's vehicle and asked some preliminary questions about his identification and car registration. Meanwhile, Officer Zimmerman talked to Deborah who informed him she thought Gurley might be intoxicated and then paused briefly to check on Goldsmith while emergency personnel were attending to his condition before joining Officer Brittin at Gurley's vehicle.

2

Based on Gurley's condition, Officer Zimmerman felt a field sobriety test was appropriate. Gurley was removed from his vehicle and escorted approximately ten to twelve feet—a distance Gurley still had trouble navigating—to the rear of an ambulance parked near the accident scene. There, Gurley momentarily took a seat on the ambulance's bumper. After this short break, Officer Zimmerman escorted Gurley to the highway median, near his patrol car. Officer Zimmerman testified he chose this location because it was safe from surrounding traffic. Repeatedly, Officer Zimmerman attempted to explain the field-sobriety tests to Gurley but was continually met not only with Gurley's rejection of such explanations but also his crude announcement of how intoxicated he was and his request to be taken to jail. The two then moved to the front of Officer Zimmerman's nearby squad car so Gurley's field sobriety test could be videotaped with the dash camera. Gurley failed to begin—let alone complete—two different field sobriety tests correctly, at which point Officer Zimmerman acceded to Gurley's requests, arresting him and securing him in the squad car. At the police station, Gurley's blood-alcohol level was tested via Intoxilyzer and read 0.295, nearly four times the legal limit.

The grand jury indicted Gurley for (1) murder; (2) four counts of first-degree wanton endangerment; (3) two counts of first-degree criminal mischief; (4) operating a motor vehicle under the influence of intoxicants, first offense, aggravating circumstances; (5) failure to maintain required automobile insurance. At trial, the jury convicted him of all charges except for the first-degree Wanton Endangerment charges, for which the jury convicted him of four

3

counts of the lesser-included offense of second-degree Wanton Endangerment. The jury recommended Gurley serve concurrently twenty-six years in prison for the murder and two-and-a-half years for the first-degree criminal mischief—a total of twenty-six years in prison. The trial court imposed sentence and entered judgment accordingly. [1]

## II. ANALYSIS.

### A. *Wantonly* was not Erroneously Defined in the Jury Instructions.

For his first argument of error, Gurley contends that the trial court instructed the jury erroneously, effectively foreclosing the jury's consideration of the lesser crime of reckless homicide and essentially directing a verdict of guilt for wanton murder. We disagree.

The trial court instructed the jury on wanton murder as follows:

> [Y]ou will find the defendant, David Franklin Gurley, Jr., guilty of Manslaughter in the Second Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
> A.    That in Jefferson County on or about the 4th day of November, 2012, the defendant caused the death of Gerald Goldsmith in a motor vehicle collision;
> AND
> B.    That in so doing, he was acting wantonly as that term is defined under Instruction No. 20.

---

[1] The trial court's judgment also sentenced Gurley to 12 months' confinement on each count of the four counts of second-degree Wanton Endangerment and 90 days' confinement on the single count of Failure to Maintain Required Insurance, all to run concurrent with the felony sentences.

Gurley does not challenge this instruction, but he does take issue with the trial court's definition of *wantonly*—Instruction No. 20—specifically, the last sentence, which reads:

> A person acts wantonly with respect to a result or to a circumstance when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. *A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto.*[2]

According to Gurley, the intoxication language in this definition foreclosed any possibility that the jury would convict him of the lesser offense of reckless homicide because the wanton mental state was conclusively proven by the uncontradicted evidence of his intoxication.[3] This argument is unpersuasive.

We need look no further than the text of the instruction to address Gurley's argument. Despite Gurley's best efforts to argue otherwise, intoxication, by itself, is not sufficient to constitute wantonness under the instruction provided to the jury. Gurley concedes the evidence regarding his intoxication was overwhelming and unchallenged. But before the jury could

---

[2] Emphasis added.

[3] Of note, Justice William E. Cooper's learned jury-instruction treatise directs that when a court includes the intoxication language in a wanton definition, "the instructions should also include the definitions of [i]ntoxication and [v]oluntary intoxication." 1 Cooper, *Kentucky Instructions to Juries* § 3.03 Comment (5th ed.) (internal references omitted). We agree with this directive. A trial court should provide the jury with the legal definitions of *intoxication* and *voluntary intoxication*. The trial court here failed to provide those definitions. Erroneous, to be sure; but, unchallenged by Gurley on appeal. In any event, we do not view this omission as warranting reversal given the circumstances of this particular case. But trial courts should be mindful of definitions necessary to aid the jury in reaching a proper verdict.

5

find Gurley acted wantonly, other questions must have been answered. The jury had to find from the evidence that Gurley created a substantial and unjustifiable risk that Goldsmith's death would occur. Under the facts of this case—especially Gurley's low rate of speed—the jury *could* have found that Gurley did not create a substantial and unjustifiable risk. If that had happened, the jury could have convicted Gurley of reckless homicide, even though Gurley's intoxication was indisputable. Again, to put it directly, wantonness is not found simply because an individual is intoxicated.

We should make clear that Gurley's repeated references to the defense of voluntary intoxication are irrelevant to the issue at hand. The intoxication language added to the definition of *wantonly* is not the same as the defense of voluntary intoxication found in Kentucky Revised Statute (KRS) 501.080.[4] Gurley is correct: voluntary intoxication, as a defense, operates to negate a particular mens rea, *i.e.* intent, and lowers the classification of the charged offense, *e.g.* intentional murder becomes wanton murder with proof of voluntary intoxication. Gurley is also correct in his assertion that KRS 501.080 applies to intentional crimes, but his attempt to parlay that into eliminating the intoxication language from the definition of *wantonly* provided to the jury is baffling. The Commentary to KRS 501.080—and Cooper's jury-instruction treatise—squarely rejects this argument: "Thus, while affording

---

[4] "Intoxication is a defense to a criminal charge only if such condition either:

(1) Negatives the existence of an element of the offense; or

(2) Is not voluntarily produced and deprives the defendant of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."

6

relief to an 'intentional' offense a defendant's intoxication will not afford relief to an offense having 'wantonness' as its essential element of culpability."[5]  If intoxication language could not be added to a wantonness definition, as Gurley seems to assert here, we are at a loss to understand how to effectuate the language of the Commentary.  And without the language challenged today by Gurley, an intoxicated individual could simply argue he was too intoxicated to be aware of and consciously disregard a substantial and unjustifiable risk as wantonness requires.[6]  Indeed, as implied by the Commentary, this is precisely the purpose of the intoxication language in the wantonness instruction.

The simple truth is that the challenged jury instruction in no way granted a de facto directed verdict for the Commonwealth.  The jury was not precluded from reaching reckless homicide.  If we were to adopt Gurley's position, we would eviscerate KRS 501.080 and KRS 501.020.  Merely because an individual is *clearly* intoxicated—and effectively admits it at trial—does not mean that a jury must find wanton conduct.  It was not impossible for the jury to have proceeded to reckless homicide.

---

[5] Cooper's treatise, mirroring the language found in KRS 501.020(3), rejects Gurley's argument simply by including intoxication in the definition of wantonness. *See* 1 Cooper, *Kentucky Instructions to Juries* § 3.03 (5th ed.).  If intoxication were only applicable or pertinent to intentional crimes, this would not have been done either by Cooper or the General Assembly.

[6] This begs the question: Without the intoxication proviso Gurley challenges, how could an intoxicated individual be found to have acted wantonly?  After all, "wanton conduct involves conscious risk-taking."  KRS 501.020 (1974 Commentary). This is the absurdity of Gurley's argument.

## B. The Trial Court Properly Denied Gurley's Motion to Strike a Juror for Cause.

Gurley argues the trial court abused its discretion by refusing to strike Juror 920513 for cause, forcing him to exercise one of his peremptory strikes to remove that juror. A juror that Gurley claims he would have stricken if he had not been forced to exercise a peremptory strike on Juror 920513 sat on the jury. The issue, therefore, is properly preserved for our review.

During voir dire, the Commonwealth asked if any of the potential jurors had been arrested for DUI or had a family member or close friend arrested for DUI to the point that they were affected by it. Juror 920513 raised her hand.

> Juror 920513: I'm Juror 920513. My sister was killed in a DUI accident thirty-plus years ago.
>
> Commonwealth: Okay. And this will be similar, a similar case. Would you be able to set that aside and look at the facts of this case independently?
>
> Juror 920513: Yes.
>
> Commonwealth: So you think you would be able to see the victim in this case and not see your sister?
>
> Juror 920513: Yes.

A similar exchange with Juror 920513 occurred during Gurley's voir dire:

> Defense counsel: We talked a little bit about how other people's drinking has impacted your lives. And, I know, ma'am [talking to Juror 920513], I think you indicated that you had been touched by a DUI accident. It was your sister? And how long ago did this happen?
>
> Juror 920513: Thirty-plus years.
>
> Defense counsel: Thirty years. I'm sorry about that loss. I'm sure that's something you think about regularly?

8

Juror 920513:    Um Hmm [yes].

Defense counsel:  When you heard the charges in this case, did it make you immediately think of that accident and that time frame?

Juror 920513:    No, it didn't. The circumstances were different.

Defense counsel:  Okay. Would you mind sharing the circumstances, and if you would rather go up . . .

Juror 920513:    She was a victim. She got in the car with a driver who was drunk, so . . .

Defense counsel:  So, in the same vehicle?

Juror 920513:    And they were teenagers.

Gurley argues the trial court acted arbitrarily because it dismissed a similar juror but did not dismiss Juror 920513. In support of this argument, Gurley urges us to resolve an alleged conflict between our decisions in *Little v. Commonwealth*[7] and *Ordway v. Commonwealth*.[8] This argument is meritless and rather than highlight a conflict, the instant circumstances indicate how these cases operate cohesively.

Juror 1008685 indicated that in the last ten years he had been affected by DUI twice: a former co-worker's young daughter and his sister-in-law's close friend were both killed by drunk drivers. When asked if these incidents would make it unlikely that he could sit fairly on Gurley's case, Juror 1008685 responded, "Most likely, yes." The Commonwealth then informed Juror 1008685 of its burden of proof and asked if he would be unable to follow the law, to which he responded, "It's just a touchy subject." The Commonwealth

[7] 422 S.W.3d 238 (Ky. 2013).
[8] 391 S.W.3d 762 (Ky. 2013).

9

then analogized reaching a guilty verdict to a math equation and informed Juror 1008685 he would not be able to take emotions into the analysis. After this, Juror 1008685 conceded and said he thought he could sit on the jury. The trial judge eventually granted the defense's motion to strike Juror 1008685 for cause.

Both Juror 920513 and Juror 1008685 were personally affected by a DUI tragedy. But the trial court's allowing one to sit and dismissing the other does not indicate arbitrariness. To the contrary, Juror 920513 is an illustration of our decision in *Little* while Juror 1008685 is illustrative of our decision in *Ordway*. Like the juror in *Little*, Juror 920513 was unequivocal in her ability to put aside her family tragedy and apply the law to the facts of the case. It is worth repeating that "[i]t is a dangerous precedent to suggest that life experience alone disqualifies a juror."[9] The totality of responses by Juror 920513 points in only one direction: she would fairly apply the law as presented to her. And just as in *Little*, a substantial amount of time had passed between the death of Juror 920513's sister and the time of Gurley's trial. Simply put, *Little* is dispositive.

As for striking Juror 1008685, that was a proper exercise of discretion under *Ordway*. Unlike Juror 920513, Juror 1008685 was equivocal in his responses regarding his impartiality. Juror 1008685 fell into the "gray area"[10] we mentioned in *Ordway*. And, consistent with *Ordway*, the trial court chose

---

[9] *Little*, 422 S.W.3d at 244.
[10] *Ordway*, 391 S.W.3d at 780.

10

cautiously to excuse the equivocal juror.[11] Far from abusing its discretion, the trial court reviewed the jurors' responses in their totality and acted wisely. We find no error.

## C. The Trial Court Correctly Denied Gurley's Motion to Suppress.

At the scene of the accident, Officer Zimmerman took Gurley by the elbow and directed him first to an ambulance, where Gurley briefly took a seat, and then to the median of the highway. In the median, Officer Zimmerman twice attempted to administer field sobriety tests to Gurley—each time Gurley abandoned the test almost immediately. After these attempts, Gurley requested Officer Zimmerman take him to jail, so Officer Zimmerman placed Gurley in the back of his patrol car. Before trial, Gurley moved to suppress statements made to Officer Zimmerman.[12] Gurley argued then, as he does now, that Officer Zimmerman had him in custody and should have provided Gurley with a reminder of his *Miranda* rights.[13] The trial court disagreed and denied Gurley's motion. We now affirm that decision.[14]

Gurley's argument fails because he was not in custody at the time the statements were made. In *Miranda*, the Supreme Court sought to protect the privilege of the Fifth Amendment against compelled self-incrimination by

---

[11] *See id.*

[12] Specifically, Gurley, with the aid of expletives, told Officer Zimmerman he was highly intoxicated, he did not know how much he had to drink, and he wished to go to jail.

[13] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[14] Our review of a trial court's ruling on a motion to suppress is two-fold: (1) the court's findings of fact are conclusive if supported by substantial evidence; and (2) the court's legal conclusions are reviewed de novo. *Commonwealth v. Marr*, 250 S.W.3d 624, 626-27 (Ky. 2008).

11

barring the prosecution from using "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant" unless proper procedural safeguards were used.[15] The Court defined *custodial interrogation* as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[16] So the warnings outlined in *Miranda* only become necessary when an individual is taken into custody and later questioned.[17] Gurley argues he was taken into custody when Officer Zimmerman took him by the elbow and escorted him to the median.

Put simply, Gurley was not in custody at any point. Officer Zimmerman's interaction with Gurley was temporary and brief, lasting only a few short minutes. And the interaction took place in the median of a public highway, reducing "the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminish[ing] the motorist's fear that, if he does not cooperate, he will be subjected to abuse."[18] Officer Zimmerman's hold on Gurley's elbow does not rise near the level of custody covered by *Miranda*. Gurley's liberty or freedom to move was marginally affected, at worst. Without Officer Zimmerman's hold on Gurley's elbow

---

[15] *Miranda*, 384 U.S. at 444.

[16] *Id.*

[17] Before a suspect in custody may be questioned, the suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

[18] *Berkemer*, 468 U.S. at 439.

perhaps he would have been free to stumble to the ground, but other than inhibiting that movement, we see little restraint. For purposes of *Miranda*, Gurley was never in custody.

Finally, Gurley attempts to argue this was no traffic stop at all; instead, Officer Zimmerman approached the situation as a crime scene. Officer Zimmerman acknowledged as much during his trial testimony. This argument is misguided because Gurley's attempted distinction is largely immaterial. *Miranda* was explicit that general on-the-scene questioning was outside the scope of its holding: "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding."[19] Nothing more than general questioning occurred here. Officer Zimmerman asked Gurley a few general questions before helping him out of his vehicle and asked him if he had been drinking. In fact, Gurley's interaction with Officer Zimmerman was nearly identical to the interaction discussed by the Court in *Berkemer*: "a single police officer ask[ing] respondent a number of questions and request[ing] him to perform a simple balancing test at a location visible to passing motorists."[20]

Because Gurley was not in custody, he was not entitled to be given warnings under *Miranda*, and the trial court correctly denied his motion to suppress.

---

[19] *Miranda*, 384 U.S. at 477.
[20] *Berkemer*, 468 U.S. at 442.

13

### D. Gurley was Entitled to a Directed Verdict on the Driving Without Insurance Charge.

As his final argument on appeal, Gurley asserts he was entitled to a directed verdict of acquittal on his driving-without-insurance charge because the Commonwealth's evidence was insufficient to meet its burden of proof. We agree.

When presented with a motion for directed verdict, "a trial court must draw all fair and reasonable inferences in favor of the Commonwealth."[21] A verdict of acquittal should not be granted, i.e. the directed-verdict motion should be denied, "if the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty."[22] On appeal, we similarly must determine "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt."[23] The Commonwealth, generally speaking, must only produce a mere scintilla of evidence to carry its burden.

If an individual owns or operates a vehicle in this state, he must have insurance. Under KRS 304.39-080(5):

> [E]very owner or operator of a motor vehicle registered in this Commonwealth or operated in this Commonwealth with an owner's permission shall continuously provide with respect to the motor vehicle while it is either present or registered in this Commonwealth, and any other person may provide with respect to any motor vehicle, by a contract of insurance or by a qualifying as a self-insurer, security for the payment of basic reparation benefits in accordance with this subtitle and security for payment of tort liabilities, arising from maintenance or use of the motor vehicle.

---

[21] *Hurt v. Commonwealth*, 409 S.W.3d 327, 331 (Ky. 2013).

[22] *Id.*

[23] *Id.* (quoting *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983)).

Failing to have insurance subjects an individual to fines or jail time under KRS 304.99-060. The Commonwealth's evidence consisted solely of Officer Brittin testifying that she did not find proof of insurance in Gurley's car when she searched the car after his arrest. Officer Brittin admitted that she did not ask Gurley about his insurance, she simply asked him for his basic information at which point Gurley provided his driver's license.

The Commonwealth offered no proof regarding the ownership of the vehicle or whether it had checked Gurley's insurance status with the Department of Vehicle Regulation, where, by statute, insurers are required to register all vehicle identification numbers of "each personal motor vehicle covered by liability insurance issued by the insurer."[24] Simply put, the Commonwealth convicted Gurley of failing to maintain automobile liability insurance with evidence indicating only that Gurley did not have proof of insurance inside his vehicle at the time of the accident. This indicates in no way whether Gurley actually had insurance at the time of the accident. At best, the Commonwealth proved Gurley may be unorganized or forgetful. This is not enough. It is not even a scintilla. The trial court erroneously denied Gurley's motion for directed verdict on this charge and, consequently, Gurley's conviction for failure to maintain car insurance is reversed.

### III. CONCLUSION.

For the foregoing reasons, Gurley's conviction for Driving Without Insurance is reversed. Gurley's remaining convictions and associated

---

[24] KRS 304.39-087(2).

15

sentences are affirmed. The case is remanded to the trial court for entry of a conforming judgment.

All sitting. Minton, C.J., Hughes, Noble, and Venters, JJ., concur. Cunningham, J., concurs in result only by separate opinion in which, Keller and Wright, JJ., join.

CUNNINGHAM, J., CONCURRING IN RESULT ONLY: I concur in result, but take issue with only one statement in the opinion. The Majority quotes from *Little* "[i]t is a dangerous precedent to suggest that life experience alone disqualifies a juror." It's not dangerous at all. Some tragic experiences are so searing as to forever preclude someone from being able to sit as a juror on a certain type of criminal case. Common sense alone dictates that a parent having a child abducted and murdered would never be able to objectively sit as a juror on a criminal prosecution of a child abduction and murder case. Unfortunately, life is full of bad experiences, some of which are so horrific as to permanently scar the soul.

Keller and Wright, JJ., join.

16

COUNSEL FOR APPELLANT:

Daniel T. Goyette
Louisville Metro Public Defender of Counsel

Bruce P. Hackett
Chief Appellate Public Defender

Aaron Michael Dyke
Louisville Metro Public Defender


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Leilani K.M. Martin
Assistant Attorney General